FILED 07 JUN '11 14:42 USDC-ORE

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON
EUGENE DIVISION

NICKOLAS FACAROS,                )
                                 )
                   Plaintiff,    )    Civil No. 10-6343-HO
                                 )
         v.                      )    O R D E R
                                 )
QWEST CORPORATION, a Colorado    )
Corporation,                     )
                                 )
                   Defendant.    )

Plaintiff Nickolas Facaros brings this action alleging violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-1968, violation of the Unlawful Trade Practices Act (UTPA), deceit, and tortious breach of the duty of good faith and fair dealing. Plaintiff alleges that on three occasions he purchased, through his agent, defendant's services to move telephone lines to facilitate moving houses from one location to another. Plaintiff alleges that defendant billed plaintiff fraudulent and unlawful charges far exceeding actual billing rates for the work that was done and has, over the past ten years, billed others similarly situated fraudulent and unlawful charges.

Defendant moves to dismiss contending all claims are barred by the tariff governing the rates and manner it may bill for relocation of its aerial cable facilities. Alternatively, defendant moves, pursuant to the primary jurisdiction doctrine, for dismissal in favor of jurisdiction by the Oregon Public Utilities Commission. In addition, defendant seeks dismissal for failure to state a claim and for failure to plead allegations of fraud with particularity.

A.  Filed Rate Doctrine

Defendant contends that a Qwest Tariff approved by the Oregon Public Utilities Commission (OPUC) governs the terms and conditions for the relocation of the telephone lines at issue. The pleadings are not entirely clear on what the services provided by defendant actually entailed. The contracts at issue indicate that this process simply required defendant to "raise and lower aerial cable facilities" for the house moves. See, e.g., Special Construction Proposal, Ex. C (attached to RICO case Statement (#27) at p. 2). There is no indication from either party that defendant dismantled aerial cables, and built new ones in their place or even dismantled cables from poles and then reattached them. A fair reading of the complaint is that defendant simply pushed the cables up and then lowered them.

The purportedly applicable tariff provisions read as follows:

    4. CONSTRUCTION CHARGES AND OTHER SPECIAL CHARGES

    4.1  GENERAL
        B.    Terms and Conditions (Cont'd)

            5.    Relocation of Existing Outside Plant Facilities

2 - ORDER

a. In locations where the Company's outside plant is of aerial construction, if the Company is requested to relocate its facilities underground, the cost of constructing the new and removing the old will be borne by the customer or others requesting relocation. See C.2., following.

b. <u>In locations where the Company's existing plant is relocated and replaced with the same type of construction, the cost of constructing the new and removing the old facilities will be borne by the customer or others requesting the relocation construction. See C.2., following.</u>

c. In locations where the Company's existing outside plant is aerial construction and the Company, at its own prerogative, buries the outside plant, the costs of construction will be borne solely by the Company.

C.   **Rates**

1. New Construction Charges shown below are applicable to work performed by the Company that is associated with providing a trench or aerial structure on a customer's private property for the construction of new drops.

|   | USOC | Charge |
|---|---|---|
| • Company-provided trench on private property | **SYFER** | $85.00 |
| • All private Company-provided | **SYEEC** | Estimated Cost |

2. <u>Relocation</u>

   <u>The Company will charge estimated costs of the relocation of existing facilities</u>.

3. Billing

   a. Bills for construction charges are not to be construed as being bills for exchange or interexchange service.

   b. A quote for a specific job will be provided to the customer or others requesting the construction. The quote will be in writing and will be good for 30 days after the issue date.

3 - ORDER

> When accepted, the customer will be billed the quoted price. A quote is not the same as an approximate figure which may be provided by the Company's personnel. An approximate figure is intended only as an order of magnitude and not as a firm price.

Original Sheets 4 and 5 of Section 4 (attached to Memo in Support of Motion To Dismiss (#29) as Ex. 1) and prior version (applicable to first house move) (attached to Reply (#49) as Ex. 1) (underline emphasis added).

Defendant argues that in accordance with the above, it is obliged to charge the estimated cost of relocating the telephone wires with respect to plaintiff's house moves. Defendant further argues that this action is an attempt to vary the terms of the above tariff and is barred by the filed rate doctrine.

Under ORS § 759.205,

> No telecommunications utility shall charge, demand, collect or receive a greater or less compensation for any service performed by it within the state, or for any service in connection therewith, than is specified in printed rate schedules as may at the time be in force, or demand, collect or receive any rate not specified in such schedule. The rates named therein are the lawful rates until they are changed as provided in this chapter.

Under ORS § 759.260,

> (1) Except as provided in ORS 759.265, no telecommunications utility or any agent or officer thereof shall, directly or indirectly, by any device, charge, demand, collect or receive from any person a greater or less compensation for any service rendered or to be rendered by it than:
>
> > a) That prescribed in the public schedules or tariffs then in force or established; or
> >
> > b) It charges, demands, collects or receives from any other person for a like and contemporaneous

4 .- ORDER

> service under substantially similar circumstances. A difference in rates or charges based upon a difference in classification pursuant to ORS 759.210 shall not constitute a violation of this paragraph.
>
> (2) Any telecommunications utility violating this section is guilty of unjust discrimination.

"Thus, rates that have been approved and are in force may be adjusted only pursuant to the process described in the statutes". Pacific Northwest Bell Telephone Co. v. Eachus, 135 Or. App. 41, 49 (1995). The filed-rate doctrine, therefore, bars an action that seeks to vary the terms of an applicable tariff. Adamson v. WorldCom Communications, Inc., 190 Or. App. 215, 222 (2003). But the doctrine only bars an action that seeks such variance and merely because a tariff exists does not mean a claim is barred. Id. Accordingly,

> the effect of a tariff on a particular claim depends on the nature of the claim and the specific terms of the tariff. If the claim is one that implicates the provisions of a tariff, then the tariff controls according to its terms, which may either limit relief available or bar a claim entirely. But if the claim is unrelated to the tariff, then the claim is not limited or barred.

Id.[1]

---

[1] There is some question whether the filed-rate doctrine applies in Oregon. See Dryer v. Portland General Elec. Co., 341 Or. 262, 270, n. 10 (2006) (No Oregon court has expressly decided whether Oregon accepts the filed-rate doctrine or the corollary rule against retroactive ratemaking). However, the statutes at issue demonstrate the necessity of the doctrine and no Oregon court appears to have declined to resort to the doctrine where applicable. See, e.g., Utility Reform Project v. Oregon Public Utility Com'n, 215 Or. App. 360, 375, n. 11 (To be clear, the Dryer court did not reject the possibility that Oregon law incorporates some form of the filed-rate doctrine or a rule against retroactive ratemaking). In any event, the tariff in question is not applicable as will be discussed.

5 - ORDER

The filed-rate doctrine does not preclude courts from interpreting the provisions of a tariff. <u>Brown v. MCI WorldCom Network Service, Inc.</u>, 277 F.3d 1166, 1171-72 (9th Cir. 2002).

The court must analyze the tariff as it would interpret any statute under the principles of statutory construction.[2] The first step in interpreting a statute is an examination of the text and its context. <u>PGE v. Bureau of Labor and Industries</u>, 317 Or. 606, 610-11, (1993). It is not required that an ambiguity in the text of a statute exist as a necessary predicate to the second step-consideration of pertinent legislative history that a party may proffer. ORS § 174.020. A party is free to proffer legislative history to the court, and the court will consult it after examining the text and context where that legislative history appears useful to the court's analysis. Finally, if the legislature's intent remains unclear after examining text, context, and legislative history, the court may resort to general maxims of statutory construction to aid in resolving the remaining uncertainty. <u>PGE</u>, 317 Or. at 612.

---

[2]Defendant argues that plaintiff is precluded from asserting that the tariff does not apply because, in his RICO case statement, he conceded that "Qwest's rates charged for the 'routing' service for relocating houses are limited by the following 'Tariff' filed with the PUC..." and cited section 4 noted above. RICO Case Statement (#27) at p. 7. Plaintiff now contends that he only meant that the tariff is limited "if the tariff is applicable." Despite the poor pleading by plaintiff's counsel, it appears a permissible reading of the RICO case statement is that Qwest is furthering a fraudulent scheme through improper application of the tariff. The sentence proceeding the apparent concession, reads, "Qwest is continuing this scheme on an ongoing basis." Prior to that statement, plaintiff asserts overcharges based on the advance payment procedure and contends that an invoice post-work with actual costs must be provided. This is contrary to the tariff and, thus, plaintiff cannot be said to have conceded the tariff applies. In any event, it is the court's mission to interpret the law and determine its applicability.

6 - ORDER

The tariff itself does not define "construction" or "relocation." The parties offer no history with respect to the tariff and the context results in ambiguity. The Tariff refers to "Construction and Other Special Charges," and refers to relocation "and replace[ment] with the same type of construction." The purportedly applicable section continues with "the cost of constructing the new and removing the old facilities will be borne by the ... others requesting the relocation construction." Finally, the alleged rate is the "estimated cost of the relocation of existing facilities." Because the rate section at issue is only referenced by the preceding mention of "constructing the new and removing the old," the requirement of using the estimated cost only comes into play when there is "construction" involved.

Defendant's apparent preferred interpretation of simply moving the wire up and down is not reasonable in this context.[3] Defendant fails to offer a reasonable definition of construction in context and, in essence, offers no definition at all and simply sidesteps the issue.

Plaintiff contends that "construction" commonly means "the act of putting parts together to form a complete and integrated object, citing Webster's Third New International Dictionary of the English

---

[3]Defendant is a bit evasive and argues that "there is nothing in this provision that requires the 'relocation construction' result in the lines and wires being permanently moved to a new location, as Facaros suggests." However, the argument fails to address what defendant actually did, which appears to be simply moving wires up (could be interpreted as relocation) and down. Arguably, the tariff could apply to construction in the exact same location, but the problem here is that no "construction" occurred.

7 - ORDER

Language at 489 (2002). Moreover, the Oregon Supreme Court has stated that "in its common use 'construction' means the creation of something new, rather than the repair or improvement of something already existing." Cabell v. City of Portland, 153 Or. 528, 541 (1936). Accordingly, a reasonable interpretation of the tariff at issue would be that the relocation requires, at a minimum, removal of the old lines and replacement with newly built lines or even poles or drops. Indeed, the language at issue specifically states "the cost of constructing the **new** and **removing the old** facilities will be borne by ..." (emphasis added). Here, it appears that defendant merely moved the lines and put the same lines back in the same place on the same poles. At best, defendant can only offer a reasonable interpretation of construction in the context (e.g., deconstruction of the existing and reconstruction of the same lines).[4] Nonetheless, replacement with completely new lines or poles is also a reasonable interpretation. Accordingly, the maxim of contra proferentum applies because defendant drafted the language at issue and submitted it for approval to the OPUC.[5] See Verizon Northwest, Inc. v. Main Street Development, Inc., 693 F.Supp.2d 1265, 1274 (D.Or. 2010):

---

[4] At oral argument, defense counsel suggested that the process may have involved "putting slack in the lines." Even if this were the case, it demonstrates only repair or improvement of already existing lines.

[5] Plaintiff also offers an interpretation of relocation as requiring more than temporary movement, but given the context, such an interpretation may not be reasonable given that the tariff contemplates relocation from aerial to underground as well as relocation with "the same construction" by removing the old and replacing with new. But the court need not decide that relocation requires permanent removal, as it can rely on the lack of "new construction" alone.

8 - ORDER

> [A]lthough it is unclear whether Verizon's tariff should be considered merely a contract, Oregon courts have applied rules of contract interpretation to tariffs in the past. See, e.g., Green Mountain Log Co. v. Columbia & Nehalem River R.R., 146 Or. 461, 471, 30 P.2d 1047 (1934). Under Oregon contract law, if a contract provision is ambiguous on its face, the court proceeds to examine the disputed provision "in the broader context of the [contract] as a whole. If-and only if-the ambiguity persists, [the court] construe[s] the [contract] against the drafter." Rick Franklin Corp. v. State ex rel. Dep't of Transp., 207 Or.App. 183, 195 n. 8, 140 P.3d 1136 (2006).

Accordingly, the motion to dismiss based on the filed-rate doctrine is denied.

B. Primary Jurisdiction

Invocation of the doctrine of primary jurisdiction is appropriate when a court decides that an administrative agency, rather than a court of law, initially should determine the outcome of a dispute or one or more issues within that dispute that fall within that agency's statutory authority. Boise Cascade Corp. v. Board of Forestry, 325 Or. 185, 192 (1997). A court confronted with problems within an agency's areas of specialization should have the advantage of whatever contributions the agency can make. Therefore, the doctrine is ordinarily invoked when it appears that a previous agency disposition of one or more issues before the court will assist the court in resolving the case before it. Id.

> "There is no fixed formula for determining whether an agency has primary jurisdiction over a dispute or an issue raised in a dispute. In making such determinations, courts consider several factors, including (1) the extent to which the agency's specialized expertise makes it a preferable forum for resolving the issue, (2) the need for uniform resolution of the issue, and (3) the potential that

9 - ORDER

> judicial resolution of the issue will have an adverse impact on the agency's performance of its regulatory responsibilities."

Id. (Quoting Kenneth Culp Davis and Richard J. Pierce, Jr., II, Administrative Law Treatise § 14.1, 272 (3d ed. 1994).

If the doctrine is invoked, disposition of the case depends on the dispute, e.g., if the entire dispute involves the agency's expertise, the action should be dismissed. Id. at 193.

The doctrine of primary jurisdiction is committed to the sound discretion of the court where the integrity of a regulatory scheme dictates preliminary resort to the agency which administers the scheme. United States v. General Dynamics Corp., 828 F.2d 1356, 1362 (9th Cir. 1987). In considering the issue, the court should weigh such factors as the need to resolve an issue that has been placed by the legislature within the jurisdiction of an administrative body having regulatory authority pursuant to a statute that subjects an industry to a comprehensive regulatory scheme requiring expertise or uniformity in administration. Id. at 1362.

Defendant requests the court to dismiss this action in favor of the OPUC's jurisdiction if application of the tariff is in doubt, if defendant's method for estimating under the tariff is in question, or if plaintiff really seeks amendment to the tariff. However, as noted above, the applicability of the tariff is not in doubt. The tariff is not applicable and thus the method for estimating the charges under the tariff cannot be in question and plaintiff cannot be seeking

amendment to the tariff. Accordingly, the motion to dismiss based on primary jurisdiction is denied.

C.  Failure to State a Claim

Plaintiff alleges that defendant violated 18 U.S.C. § 1961(a) and (b) by engaging in mail and wire fraud, receiving income from a pattern of racketeering activity and investing it in its operations. Defendant contends that plaintiff fails to allege a plausible claim supported by mail fraud.

To plead a claim for mail or wire fraud, plaintiff must allege that defendant (1) used or caused the use of the mail or wires in interstate commerce; (2) in furtherance of a scheme to defraud; (3) with the intent to defraud. 18 U.S.C. §§ 1341, 1343. Plaintiff simply concludes that he has adequately alleged a scheme to defraud because he contends that defendant misrepresented the estimates as representing the actual cost of moving defendant's lines and that such scheme was furthered by sending billing statements through the mail (or through electronic wires via facsimile)

However, the special construction proposals attached to the RICO case statement do not, and cannot, support the allegation. The proposals described the work to be done and required "advance payment." Further, the proposals also state that "for government customers only, Qwest will submit an invoice of charges upon completion of work." The proposals clearly state that no work shall commence prior to receipt of advance payment and nothing in the

11 - ORDER

proposals indicates that the required payment represented actual costs and no reasonable set of facts could lead to the conclusion that advance payment for proposed work represents actual costs. Plaintiff does plead that

> in the second house move, plaintiff informed Qwest on the Friday before the Sunday move that the charges were too high; Qwest disagreed and maintained that data was properly entered into a computer program; plaintiff paid Qwest under protest; and Qwest promised a refund, which has never been paid.

Amended Complaint at ¶ 21 (#22).

However, this does not lead to a reasonable inference that defendant misrepresented the required advance payment as an actual cost. Moreover, the proposals stated that, upon execution, they shall, along with the attached terms and conditions, constitute a binding agreement. In addition, the second proposal under which plaintiff alleges a promised refund (ostensibly to demonstrate a misrepresentation as to actual costs) contained an integration clause in which the written terms and conditions contained in the agreement constituted the entire agreement and no other terms or conditions are applicable. See Ex. B, page 3 to RICO cases statement (#27). The agreement further provided that all amendments must be in writing and signed by the parties' authorized representatives. Consequently, leave to amend would be futile.

No logical reading of the mailings and/or facsimiles could support a conclusion that they could further the alleged fraudulent scheme as the documents, on their face, delineate that the costs are calculated prior to the work and must be paid pre-work. If there is

12 - ORDER

a fraudulent scheme to represent estimated costs as actual costs--then the documents actually negate that scheme, not further it. Such cannot support a RICO case based on mail or wire fraud. C.f., Wolman v. Catholic Health System of Long Island, 2010 WL 5491182 at * 6 (December 30, 2010 E.D.N.Y.):

> Plaintiffs' RICO claims fail on numerous grounds. But, chiefly, Plaintiffs fail to allege any pattern of racketeering activity. See DeFalco v. Bernas, 244 F.3d 286, 305 (2d Cir. 2001). Plaintiffs attempt to meet this requirement by alleging mail fraud. But, to be actionable, a purportedly false or deceptive mailing must further the alleged fraudulent scheme. See United States v. Maze, 414 U.S. 395, 403, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974). And here, Plaintiffs allegations that the pay stubs furthered the supposed scheme are not just implausible, they are illogical. Plaintiffs contend that the pay stubs "misled Plaintiffs and Class Members about the amount of wages to which they were entitled, the number of hours which they had worked, and whether defendants had included all compensable work time." (SAC ¶ 100.) But Plaintiffs do not allege that they suffer from anterograde amnesia, or otherwise lack the capacity to retain short-term memories. So they should have recalled how much they actually worked in a given work week. Thus, to the extent that the mailed pay stubs differed from Plaintiffs' recollection, that difference did not "conceal" the fraudulent scheme. Quite the opposite: it should have placed Plaintiffs on notice that Defendants were not fully paying them for their work.

Plaintiff presents authority for the proposition that a RICO claim predicated on mail fraud need not allege reliance on the asserted misrepresentation. Bridge v. Phoenix Bond and Indemnity Co., 553 U.S. 639 (2008). However, plaintiff's RICO claim fails not because no reasonable person could have relied on the alleged misrepresentation that estimated costs equal actual costs, but because no plausible set of facts could demonstrate that the mailings and/or facsimiles could further the fraudulent scheme to represent inflated

13 - ORDER

estimates as actual costs. What plaintiff really alleges in this case is a voidable contract based on adhesion or some other theory grounded in contract law. Generally, parties to a contract can agree to any price for a given service regardless of what the market would determine is a reasonable value. But where one party holds such a position in the contractual relationship allowing it to force the other party to agree to its price terms, the contract may be voidable and the price terms will be substituted with actual value provided. However, a voidable contract under these circumstances does not support a RICO cause of action.

Defendant also asserts that plaintiff lacks standing to assert a RICO claim because he purchased defendant's services through an agent. Although RICO requires direct injury, plaintiff is directly injured even though he utilized an agent because he was the principal.[6] Nevertheless, the RICO claims fail as noted above.

Additionally, plaintiff has failed to properly allege investment injury required for his 18 U.S.C. § 1962(a) claim. See Nugget Hydroelectric, L.P. v. Pacific Gas and Elec. Co., 981 F.2d 429, 437 (9th Cir. 1992) (a plaintiff seeking civil damages for a violation of section 1962(a) must allege facts tending to show that he or she was injured by the use or investment of racketeering income).

Defendants also contend that plaintiff fails to state a claim for all claims because he fails to allege fraud with particularity. Although it cannot be discerned from the pleadings when, how, where,

---

[6]Or at least plaintiff could amend to demonstrate this fact.

14 - ORDER

or even who made the alleged fraudulent statement that the estimates equal actual costs, such deficiencies could conceivably be cured by amendment. But, as noted above, the mail fraud claim cannot be cured by amendment because no reasonable set of facts could be alleged to demonstrate the mailings and facsimiles furthered such scheme. In addition, the court declines to retain jurisdiction over the remaining state law claims.

When federal claims are dismissed before trial, it is wholly within the district court's discretion to dismiss state claims. <u>United Mine Workers v. Gibbs</u>, 383 U.S. 715, 726 (1966); <u>see also</u> <u>Schneider v. TRW, Inc.</u>, 938 F.2d 986, 993-94 (9th Cir. 1991). The court has not invested its judicial energies to such an extent that would justify retaining jurisdiction. <u>See</u> <u>Schneider</u>, 938 F.2d at 994; <u>Wren v. Sletten Const. Co.</u>, 654 F.2d 529, 536 (9th Cir. 1981). Nor is it apparent that judicial economies would be served by retaining jurisdiction over this case. <u>See</u> <u>Schneider</u>, 938 F.2d at 994. This attempted use of RICO to try to transform a minor contract dispute into a federal case should not demand anymore of this court's time.

D.  <u>Stay Discovery</u>

Defendant also seeks to stay discovery pending resolution of the motion to dismiss. Given that the court has resolved the motion to dismiss, the motion to stay is denied as moot.

15 - ORDER

## CONCLUSION

For the reasons stated above, defendant's motion for a protective order staying discovery (#30) is denied, and defendant's motion to dismiss (#28) is granted and this action is dismissed.

DATED this 7th day of June, 2011.

                                        Michael R. Hogan
                                      United States District Judge